UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PREMIER GAMING TRAILERS, LLC,

    Plaintiff,

v.                   Case No.: 8:16-cv-3378-T-33TGW

LUNA DIVERSIFIED ENTERPRISES,
INC.,

    Defendant.
_____/

## ORDER

This matter comes before the Court pursuant to Defendant Luna Diversified Enterprises, Inc.'s Motion for Summary Judgment (Doc. # 46), filed on October 31, 2017. Plaintiff Premier Gaming Trailers, LLC, responded on November 30, 2017. (Doc. # 52). Luna filed its reply on December 14, 2017. For the reasons that follow, the Motion is granted in part and denied in part as set forth herein.

## I.  Background

This lawsuit revolves around the submission of a bid for a contract with the federal government — specifically, a bid to build mobile gaming kiosks for the Army.

Premier Gaming Trailers is a custom fabricator company that builds mobile gaming trailers in Tampa, Florida. (Doc. # 1 at ¶ 8). Although not registered with the Small Business

Administration (SBA), Premier Gaming is a small company with fewer than five employees and less than $750,000 in gross revenue. (Bekhor Aff. Doc. # 52-5 at ¶ 10; Bekhor Dep. Doc. # 46-2 at 9:10-20). Lidan Bekhor is the sole owner and manager of Premier Gaming. (Bekhor Dep. Doc. # 46-2 at 7:12-18).

Bekhor had no experience with government contracts or the federal bidding process. (Id. at 7:6-11). Thus, he was unaware of when a federal bid becomes a binding contract and did not understand small business set-aside contracts or the Federal Acquisition Regulations (FARS), which govern the eligibility and requirements for contracting with the federal government. (Id. at 11:4-16). Premier Gaming never registered with the federal government's system for award management, SAM, and had never directly submitted a bid for a federal contract before. (Id. at 15:7-25). Instead, on the few occasions Premier Gaming sought to bid on a federal contract, Premier Gaming "looked to partner with somebody who is experienced to guide" it through the process. (Id. at 62:3-12, 58:6-19, 102:4-9).

One such entity Premier Gaming trusted to understand federal contracts was Luna. Luna is a company that provides all types of merchandise and services to federal and state agencies exclusively, by submitting bids in response to

2

various federal and state bid solicitations. (Gina Dep. Doc. # 46-3 at 6:6-7:13). Luna is a small business, registered with and certified by the SBA, and has between three and five employees at any given time. (Curry Dec. Doc. # 46-6 at ¶ 1; Curry Dep. Doc. # 46-4 at 6:7-9). Alma Gina, nee Hoffman, is the sole owner of Luna and maintains the sole authority to enter binding contracts. (Gina Dep. Doc. # 46-3 at 6:15, 9:15-19, 27:1-10; Curry Dep. Doc. # 46-4 at 10:11-17). Luna's "operations manager," Jason Curry, "manage[d] the day-to-day operations of the company in terms of [its] contract fulfillments, as well as internal staff issues, as well as [its] in-house IT." (Curry Dep. Doc. # 46-4 at 5:24-6:4).

The other Luna employee who figures prominently in this case is Marcos Morales. Morales works in "solutions development" for Luna, and his job entails "getting pricing [from suppliers] and building and submitting quotes to the customer, which included signing nonbinding solicitation paperwork." (Morales Dep. Doc. # 46-5 at 5:19-23, 41:13-19; Curry Dep. Doc. # 46-4 at 10:18-11:4). According to Curry, Morales' job is "to find sources of product and get prices," and he can submit bids to contracts "for simplified acquisitions." (Curry Dep. Doc. # 46-4 at 10:20-25). But Morales did not have the authority to make binding decisions

on behalf of Luna, such as entering contracts with suppliers or customers. (Gina Dep. Doc. # 46-3 at 27:1-10; Morales Dep. Doc. # 46-5 at 42:19-20, 48:11-19; Curry Dep. Doc. # 46-4 at 14:23-25, 23:22-23).

And, although he helped put bids together for government contracts, Morales had never been trained in the FARS and stated that he did not understand them. (Morales Dep. Doc. # 46-5 at 50:7-22; Curry Dep. Doc. # 46-4 at 13:24-14:6). Instead, Morales assumed that the suppliers he contacted about pricing on potential bids would be aware of their own eligibility under federal regulations for the bid opportunities Morales spoke about with them. (Morales Dep. Doc. # 46-5 at 50:12-22). Still, Morales' lack of familiarity with these regulations was not an issue because other Luna employees research the applicability of the FARS for each contract only after a tentative bid award is issued to Luna. (Gina Dep. Doc. # 46-3 at 19:11-19; Curry Dep. Doc. # 46-4 at 8:9-17). This is because a bid is not binding, and a bidder can decline to enter a contract even if it receives notice of its bid being selected. (Curry Dec. Doc. # 46-6 at ¶ 2).

Beginning in August of 2016, Morales contacted Premier Gaming about other gaming trailer bids, and Luna submitted three bids for those gaming trailer contracts with Premier

Gaming in mind as a vendor. (Doc. 1-1 at 2; Morales Dep. Doc. # 46-5 at 13:12-14:3; Bekhor Aff. Doc. # 52-5 at ¶ 7). Those three bids had been for contracts Curry described as "simplified acquisition" contracts, for which Morales had authority to submit non-binding bids. (Curry Dep. Doc. # 46-4 at 10:23-25, 12:15-13:8). Gina was not aware that Morales had worked with Premier Gaming on the quotes before submitting these bid proposals, (Gina Dep. Doc. # 46-3 at 27:11-15), perhaps because none of those previous bids had been awarded to Luna. (Bekhor Dep. Doc. # 46-2 at 25:25-26:5; Curry Dep. Doc. # 46-4 at 12:15-18).

In September of 2016, Bekhor of Premier Gaming contacted Morales to notify him of the Army's bid solicitation for mobile gaming kiosks and to begin working on a bid together. (Bekhor Dep. Doc. # 46-2 at 18:2-12). The gaming kiosks would be used for marketing and recruitment purposes and were to include, among other things, a 42-inch television screen, X-Box gaming systems, and numerous speakers. (Doc. # 49-2 at 15-25). Although he had no records of any pricing or design research, Bekhor testified that he called various vendors and suppliers of metal and electrical parts for pricing around this time, so that he could come up with a price quote for the bid. (Bekhor Dep. Doc. # 46-2 at 33:7-35:15). As Bekhor

understood his conversations with Morales, Premier Gaming would produce one hundred percent of the kiosks and handle delivery, with Premier Gaming to receive ninety-seven percent of the contract price and Luna to receive the remaining three percent. (Id. at 46:3-21, 98:8-11, 99:1-6).

On September 26, 2016, Morales signed an "Amendment of Solicitation/Modification of Contract," which included modifications by the Army to its solicitation for bids for the gaming kiosks. (Doc. # 50-3 at 14). Gina stated in her deposition that Morales "would not have authority" to sign the document, but she was "not surprised" to see that he had signed because it was "just a solicitation" that did not "bind [Luna] to anything" and Gina had been "going through a lot in that period" of time. (Gina Dep. Doc. # 46-3 at 48:23-50:13).

Then, Morales emailed a copy of the Army's specifications for the desired gaming kiosks to Bekhor on September 27, 2016, at 12:05 PM, including the Army's drawings of the proposed kiosks. (Doc. # 49-2 at 9; Bekhor Dep. Doc. # 46-2 at 30:2-21). About four and a half hours later, an employee of Premier Gaming sent its bid information to Morales, including the price Bekhor suggested for the kiosks and specifications for the kiosks. (Doc. # 50-1 at 1-5; Bekhor Dep. Doc. # 46-2 at 32:5-8, 39:1-7). Bekhor acknowledges that

he expended no money in putting together the bid information. (Bekhor Dep. Doc. # 46-2 at 41:4-16). The specifications Premier Gaming sent included numerous deviations from the specifications in the Army's solicitation, such as including fewer X-Box consoles than requested, changing the USB connector, phone charger, and power cord specifications, and increasing the thickness of the kiosk. (Id. at 51:18-52:21, 72:17-22, 75:24-77:25; Doc. # 50-1 at 4-7).

The bid proposal attached to the email sent from Premier Gaming to Morales states: "Thank you for taking the time to consider Premier Gaming [] as a potential partner in producing and manufacturing your proposed customized gaming units." (Doc. # 50-1 at 3; Bekhor Dep. Doc. # 46-2 at 39:8-18). Bekhor testified that the "potential partner" language was standard and used in all such communications, but that he considered Luna as an actual partner at that time. (Bekhor Dep. Doc. # 46-2 at 39:11-40:18, 43:15-44:9). Bekhor also acknowledged there was never a signed contract between Premier Gaming and Luna. (Id. at 96:12-22). Rather, Bekhor stated that the alleged joint venture agreement between Premier Gaming and Luna was an oral contract, as evidenced by Bekhor's conversations and emails with Morales. (Id. at 96:23-97:1).

During each bid for which Bekhor worked with Morales, Bekhor "underst[ood] that each company was working together" so that Premier Gaming "would supply its experience and know how on mobile kiosks and mobile computer units, and Luna would supply its expertise in government contract bidding and experience." (Bekhor Aff. Doc. # 52-5 at ¶ 7). At no time did Morales "disclose[] to [Bekhor] any limitation on the scope of his authority to enter into binding agreements on Luna's behalf." (Id. at ¶ 6). Morales was Bekhor's only point of contact and Bekhor believed Morales "also had the authority to engage with and enter into agreements with both [Premier Gaming] and the Army" on behalf of Luna. (Id.). Nevertheless, Bekhor admitted that he was unaware of what position Morales held with Luna and never asked Morales because "it didn't make a difference" to him. (Bekhor Dep. Doc. # 46-2 at 19:20-20:21, 95:18-21).

On September 27, 2016, at 5:49 PM, Morales emailed Karyn Williams with the Army to ask whether the Army allowed partial invoicing — a question Premier Gaming had. (Doc. # 50-3 at 24). After learning that the Army would allow for partial invoicing, Morales then emailed Premier Gaming at 7:11 PM, writing "this email is to confirm both Luna and [Premier Gaming's] acceptance to DUAL CHECK terms for the project in

case of Award." (Doc. # 1-2 at 2; Doc. # 50-4 at 3). Morales testified that he had no authority to decide payment terms with a supplier, as payment terms have to be approved by Gina. (Morales Dep. Doc. # 46-5 at 16:15-17:15). Rather, he acknowledged that he was very busy with various bids in September, which is the end of the fiscal year, and "spoke out of place" regarding the dual check terms. (Id. at 16:18-17:5). And, indeed, payment via dual checks was unavailable under the contract because the federal government "doesn't allow for dual checks," and the solicitation instead provided for payment "by electronic fund transfer." (Curry Dep. Doc. # 46-4 at 32:5-10, 33:1-3; Bekhor Dep. Doc. # 46-2 at 68:6-15).

As Bekhor testified in his deposition, no other conversations between Bekhor and Morales took place about "profit, expenses, [or] loss." (Bekhor Dep. Doc. # 46-2 at 21:12-24). Yet, in his affidavit, Bekhor asserts Premier Gaming and Luna "agreed that the parties would each share in the profit or loss from their collaborative effort to obtain and perform the contract." (Bekhor Aff. Doc. # 52-5 at ¶ 7).

Later that night, September 27, 2016, Morales went ahead and submitted the bid using the information provided by Premier Gaming. (Morales Dep. Doc. # 46-5 at 28:3-29:2; Doc.

# 50-3 at 25; Doc. # 50-1 at 6-25). Morales' name and title are listed in the "Name and Title of Signer" box on the bid solicitation form, Standard Form 1449. (Doc. # 50-1 at 12). Gina stated that, at some unspecified time, she had given Morales permission to submit a bid for the Army's solicitation but was unaware that Premier Gaming was the vendor from which Morales had received the price quote. (Gina Dep. Doc. # 46-3 at 16:6-17:25).

During his deposition, Bekhor could not clearly articulate any false statements made by Morales, or anyone else at Luna, before the bid was submitted to the Army. (Bekhor Dep. Doc. # 46-2 at 82:20-83:20). Nevertheless, Bekhor stated that he and Morales agreed the bid using Premier Gaming's bid information was "the only bid" and "[s]hould it be awarded, [Premier Gaming] was going to be the supplier." (Id. at 89:4-6). And, in his affidavit, Bekhor states "[Premier Gaming] would not have expended the time and effort in creating the Bid Information and would not have provided the same to Luna had Luna not misrepresented to [Premier Gaming] that [Premier Gaming] would supply the Units in the event Luna was the successful bidder on the Solicitation." (Bekhor Aff. Doc. # 52-5 at ¶ 12).

The next day, September 28, 2016, Morales was contacted by Williams, who requested that Luna provide a "drawn concept with measurements and descriptions that represent the final product" with its bid. (Doc. # 50-4 at 6). Morales wrote back to Williams, stating "According to our supplier, he will have [the drawings] to me in the next 30 min[utes]." (Id.). During his deposition, Morales testified that "our supplier" was "a poor choice of words on [his] part." (Morales Dep. Doc. # 46-5 at 35:13-19).

So, Morales emailed Bekhor asking Premier Gaming to provide a drawing very quickly. (Doc. # 50-4 at 1-2). An employee of Premier Gaming emailed Morales back with a drawing of the proposed gaming kiosks about twenty minutes later. (Bekhor Dep. Doc. # 46-2 at 85:25-86:11; Doc. # 50-4 at 1-5). The drawing provided by Bekhor is "very similar" to the drawing provided by the Army in its solicitation, except that the kiosk is marked with Premier Gaming's logo in the corner of the image. (Morales Dep. Doc. # 46-5 at 54:16-56:6; Bekhor Dep. Doc. # 46-2 at 85:21-86:3; Doc. # 50-4 at 4-5). Morales then emailed the drawing provided by Premier Gaming to Williams. (Doc. # 50-4 at 8).

While Morales was in contact with Premier Gaming and putting together the bid, he was unaware that Curry was

already speaking to potential suppliers about the gaming kiosks in order to put together a different bid for the Army contract. (Morales Dep. Doc. # 46-5 at 37:3-12; Curry Dep. Doc. # 46-4 at 18:8-20:2). Although the previous gaming trailer bids had been "simplified acquisitions," Curry stated the Army solicitation was not a simplified acquisition because "it [was] a design-build service." (Curry Dep. Doc. # 46-4 at 11:9-14). Morales' job did not entail submitting bids for more complex contracts, only simplified acquisitions. (Id. at 11:1-4).

After speaking to various suppliers, Curry had done a cost calculation for what the Army kiosks would cost Luna to build and had drawn rough "sketch-ups" for the gaming kiosks according to the Army's specifications. (Curry Dep. Doc. # 46-4 at 18:8-20:2, 20:22-21:2). Curry passed that number along to Luna's sometimes-sales representative, Carlos Colon, who was supposed to factor in a mark-up to ensure Luna would profit if it was ultimately awarded the contract. (Id. at 6:14-21, 19:23-20:3, 29:23-30:4, 59:9-16). Curry was under the impression that Colon would add in the mark-up and then Morales would submit Curry's bid proposal to the Army. (Id. at 60:4-23). Indeed, at that time, Curry was under the impression that the bid proposal he drafted was submitted and

was the one selected by the Army. (Id. at 25:9-12, 26:20-25, 33:11-13). Curry was unaware that Morales had been preparing a separate bid with Premier Gaming in mind as the supplier. (Id. at 50:12-17).

On September 30, 2016, the Army notified Luna that its bid had been selected, thereby triggering the 72-hour period in which Luna could review the FARS and other related documents before signing a binding contract with the Army. (Doc. # 50-4 at 13; Curry Dec. Doc. # 46-6 at ¶ 2). Again, this 72-hour period exists because a bid is not binding — a bidder can decline to enter a contract even if it receives notice of its bid proposal being selected. (Curry Dec. Doc. # 46-6 at ¶ 2).

Also on September 30, 2016, Gina, on behalf of Luna, signed a federal Standard Form 1449, accepting the Army's specifications, as a binding contract with a total award of $1,233,178.48. (Doc. # 51-1 at 2-3). "None of the contract deviations from [the Army's specifications] that were in [Premier Gaming's] proposal were in this contract." (Curry Dec. Doc. # 46-6 at ¶ 2; Curry Dep. Doc. # 46-4 at 29:16-22). "The schematic diagrams [Luna] used to produce these kiosks were costly CAD drawings, not anything [Premier Gaming]" created for the bid proposal. (Curry Dec. Doc. # 46-6 at ¶

4). But the price from the bid submitted to the Army did remain the same for the final contract. (Doc. # 51-1 at 2-3; Doc. # 50-1 at 7).

Sometime after the Army selected Luna's bid, Morales informed Curry that he had spoken with Premier Gaming about being the supplier of all work on the gaming kiosks, which was the typical division of labor for simplified acquisition contracts. (Curry Dep. Doc. # 46-4 at 23:2-24:3, 50:18-51:2, 53:16-19, 58:1-7). But the Army's bid solicitation had a small business set-aside, which required that the contract be awarded to and at least fifty percent of the work be provided by a certified small business, like Luna. (Gina Dep. Doc. # 46-3 at 56:12-57:1; Curry Dep. Doc. # 46-4 at 44:6-12).

Meanwhile, Bekhor was waiting to hear back from Luna about the Army bid. He grew impatient after numerous calls to Morales went unanswered over the weeks, so Bekhor called the Army sometime in October of 2016 and learned the contract had been awarded to Luna. (Bekhor Dep. Doc. # 46-2 at 23:8-24:9). Bekhor then called Luna and Curry answered the phone. During the tense conversation that ensued, Curry informed Bekhor that Luna had been awarded the Army contract but that Premier Gaming would not be the supplier of the gaming kiosks. (Id. at 23:8-24:25; Curry Dep. Doc. # 46-4 at 45:11-46:2).

On October 28, 2016, counsel for Premier Gaming sent Gina a demand letter, demanding "a single payment of $300,000 in full satisfaction of all claims against" Luna. (Doc. # 52-7 at 15-16). Curry testified that Gina approved him reaching out to an attorney to respond to Premier Gaming's demand letter. (Curry Dep. Doc. # 46-4 at 55:22-56:8). But Gina stated that she alone had authority to hire an attorney for Luna and did not remember authorizing Curry to do so. (Gina Dep. Doc. # 46-3 at 35:15-37:6).

Premier Gaming initiated this action on December 9, 2016, asserting claims for breach of joint venture agreement (Count I), unjust enrichment (Count II), fraud in the inducement (Count III), and conversion (Count IV). (Doc. # 1). Luna filed its Answer on March 27, 2017. (Doc. # 20). At the Court's direction, the parties mediated on September 7, 2017, but met an impasse. (Doc. ## 39, 41).

Now, Luna moves for summary judgment on all claims. (Doc. # 46). Premier Gaming filed a response, (Doc. # 52), and Luna replied, (Doc. # 53). The Motion is ripe for review.

## II. **Legal Standard**

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue

for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988)(citing <u>Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. **Analysis**

As a preliminary matter, the Court notes that Premier Gaming failed to properly respond to Luna's Statement of Material Facts. This Court's website sets forth the following

requirements, which are in place to expedite the summary judgment stage of a civil case.

> Each response in opposition to a motion for summary judgment must include a specifically captioned section titled, "Response to Statement of Material Facts." The opposing party's response must mirror the statement of material facts by admitting and/or denying each of the moving party's assertions in matching numbered paragraphs. Each denial must set forth a <u>pinpoint</u> citation to the record where the fact is disputed. Although the opposing party's response must correspond with the paragraph scheme used in the statement of material facts, the response need not repeat the text of the moving party's paragraphs. In deciding a motion for summary judgment, <u>the Court will deem admitted any fact in the statement of material facts that the opposing party does not specifically controvert, provided the moving party's statement is supported by evidence in the record</u>. Additional facts that the party opposing summary judgment contends are material shall be numbered and placed at the end of the opposing party's response and include a <u>pinpoint</u> citation to the record where the fact is established.

Premier Gaming's response does not comply with this requirement because it does not contain a section titled "Response to Statement of Material Facts," and does not admit or deny Luna's Statement of Material Facts in matching numbered paragraphs. Accordingly, provided Luna's statements are supported by evidence in the record, the Court will deem admitted Luna's Statement of Material Facts.

Luna argues that judgment should be entered in its favor for each of the Complaint's four counts. The Court will address each count in turn.

## A.  Breach of Joint Venture Agreement

In Count I, Premier Gaming asserts a claim for breach of the Joint Venture Agreement. (Doc. # 1 at 5). Luna argues that the alleged Joint Venture Agreement is not a binding contract for various reasons. Because the Court finds Luna's apparent authority argument determinative, the Court addresses that argument alone.

Luna argues that the alleged Joint Venture Agreement is not binding because Morales, the point of contact for Bekhor, did not have actual or apparent authority to enter into binding agreements on behalf of Luna. (Doc. # 46 at 12-14). The parties assume the applicability of Florida law to the alleged agreement, as does the Court. See In re British Am. Ins. Co. Ltd., No. 09-31881-EPK, 2013 WL 211314, at *9 n.11 (Bankr. S.D. Fla. Jan. 18, 2013)("Both parties assume Florida law applies to the aiding and abetting breach of fiduciary duty claims. This does not appear to be in error, and so the Court applies Florida law."), report and recommendation adopted sub nom. In re British Am. Isle of Venice (BVI) Ltd., No. 12-81329-CIV, 2013 WL 1566648 (S.D. Fla. Apr. 12, 2013).

"[T]he existence of an agency relationship is a question of fact." Archer v. Trans/Am. Servs., Ltd., 834 F.2d 1570, 1572–73 (11th Cir. 1988). "In Florida, [i]t is well-established that an agent's authority may be inferred from acts, conduct and other circumstances." Bd. of Tr. of City of Delray Beach Police & Firefighters Ret. Sys. v. Citigroup Glob. Markets, Inc., 622 F.3d 1335, 1343 (11th Cir. 2010)(citation and internal quotation marks omitted). A grant of express authority implies "the authority to do acts that are incidental to it, usually accompany it, or are reasonably necessary to accomplish it." Id. at 1342–43 (citation omitted).

Premier Gaming argues that Morales did have "express authority to enter into agreements" and "implied authority to enter into agreements with suppliers" "incidental to Morales' express authority to obtain pricing and build quotes." (Doc. # 52 at 13). Premier Gaming points out that Morales executed an "Amendment of Solicitation/Modification of Contract" and signed his name on the line for the "signature of the person authorized to sign." (Doc. # 50-3 at 14). Although Gina testified Morales did not have authority to do so, she was "not surprised" to see that Morales had signed the document because she "was going through a lot in that period" and the

document was "just a solicitation" that did not "bind [Luna] to anything" (Gina Dep. Doc. # 46-3 at 48:23-50:13).

Even if the signed modification or bid submission documents do not support that Morales had express authority to bind Luna, Premier Gaming insists that "Morales was acting within his implied authority in entering into the Joint Venture Agreement, acquiring the bid information, and submitting the Army Bid" because Morales did have express authority to "find solicitations for Luna to bid on, to obtain pricing from suppliers, and build quotes." (Doc. # 52 at 10).

The Court agrees with Luna that, taking all the evidence in the light most favorable to Premier Gaming, Morales did not have actual or implied authority to enter into the Joint Venture Agreement. Premier Gaming has presented no evidence refuting the deposition testimony of Gina, Curry, and Morales, who all agreed that Gina alone had authority to enter binding contracts. (Gina Dep. Doc. # 46-3 at 27:1-10; Morales Dep. Doc. # 46-5 at 42:19-20, 48:11-19; Curry Dep. Doc. # 46-4 at 14:23-25, 23:22-23). For example, Premier Gaming has not presented another instance in which Morales entered a binding contract or made another binding decision. Additionally, the Luna employees agreed that Morales' job entailed "getting pricing [from suppliers] and building and submitting quotes

to the customer." (Morales Dep. Doc. # 46-5 at 5:19-23, 41:13-19).

Premier Gaming has presented no evidence that entering into binding joint venture agreements with suppliers is reasonably necessary to accomplish Morales' job of obtaining pricing information to prepare quotes for non-binding bids. Thus, such ability is not part of Morales' implied authority. The evidence does not support that Morales had actual or implied authority to enter into a joint venture agreement — i.e., a binding oral contract — with Premier Gaming.

But the Joint Venture Agreement could still be binding on Luna if Morales had apparent authority to bind Luna. See Ja Dan, Inc. v. L-J, Inc., 898 F. Supp. 894, 900 (S.D. Fla. 1995)("If an agent has apparent authority to enter into a contract on a principal's behalf, the contract is enforceable against the principal."). "Under the doctrine of apparent authority, an agency will arise when the principal allows or causes others to believe that an individual has authority to conduct the act in question, inducing their detrimental reliance." Nat'l Auto Lenders, Inc. v. SysLOCATE, Inc., 686 F. Supp. 2d 1318, 1322 (S.D. Fla. 2010)(citing Borg-Warner Leasing, a Div. of Borg-Warner Acceptance Corp. v. Doyle Elec.

Co., Inc., 733 F.2d 833, 836 (11th Cir. 1984)), aff'd, 433 F. App'x 842 (11th Cir. 2011).

"There are three elements 'needed to establish apparent agency: (1) a representation by the purported principal; (2) reliance on that representation by a third party; and (3) a change in position by a third party in reliance [] upon such relationship.'" Id. (quoting Blunt v. Tripp Scott, P.A., 962 So. 2d 987, 989 (Fla. 4th DCA 2007)). "The reliance of a third party on the apparent authority of the principal's agent must be reasonable and rest in the actions of or appearances created by the principal . . . and not by agents who often ingeniously create an appearance of authority by their own acts." Blunt, 962 So.2d at 989 (internal citations omitted).

"Apparent authority does not arise from the subjective understanding of the person dealing with the purported agent, nor from the appearance created by the purported agent himself; instead, apparent authority exists only where the principal creates the appearance of an agency relationship." Ja Dan, Inc., 898 F. Supp. at 900. A principal can create the appearance of an agent's authority "by knowingly permit[ting] [an] agent to act in a certain manner as if he were authorized," "by failing to correct a known misrepresentation by an agent that he or she has certain authority," or "by

silently acting in a manner which creates a reasonable appearance of an agent's authority." Id. (citations and internal quotation marks omitted).

Luna insists that its principal, Gina, did not create the appearance of Morales' authority in any way. (Doc. # 46 at 13). In contrast, Premier Gaming argues that Gina did create the appearance of apparent authority for Morales: "Gina placed Morales in such a situation that [Premier Gaming] was justified in relying upon Morales' authority to enter into binding agreements on Luna's behalf." (Doc. # 52 at 12). Specifically, Premier Gaming emphasizes that Morales was Premier Gaming's sole point of contact, informed Premier Gaming when the bid was submitted, and discussed payment terms with Bekhor. (Id. at 11). Premier Gaming notes that Morales engaged in acts for which Morales supposedly had no authority, including submitting the bid to the Army. (Id.). According to Premier Gaming, "Gina's omissions in not preventing or correcting these purportedly unauthorized acts has the effect of cloaking Morales in apparent authority." (Id. at 12).

It is true that an "apparent agency can arise even in the face of the principal's silence when the principal by its actions creates a reasonable appearance of authority." Borg-Warner Leasing, 733 F.2d at 836. And

> [w]here a principal has, by his voluntary act,
> placed an agent in such a situation that a person
> of ordinary prudence, conversant with business
> usages and the nature of the particular business,
> is justified in presuming that such agent has
> authority to perform a particular act, and
> therefore deals with the agent, the principal is
> estopped, as against such third person, from
> denying the agent's authority.

Orlando Exec. Park, Inc. v. P. D. R., 402 So. 2d 442, 449
(Fla. 5th DCA 1981), approved sub nom. Orlando Exec. Park,
Inc. v. Robbins, 433 So. 2d 491 (Fla. 1983); see also Cavic
v. Grand Bahama Dev. Co., 701 F.2d 879, 886 (11th Cir.
1983)(noting that apparent authority exists "where the
principal knowingly permits the agent to assume such
authority or where the principal by his actions or words holds
the agent out as possessing it" (citation omitted)).

But Premier Gaming ignores that all the examples of
Morales engaging in unauthorized acts involved acts that were
non-binding on Luna, such as signing a solicitation
modification document and submitting a non-binding bid. To
the extent Gina failed to prevent these unauthorized acts,
Gina's omissions did not create the apparent authority for
Morales to enter into binding agreements on behalf of Luna.

Nor does Curry's alleged unauthorized hiring of an
attorney on Luna's behalf support that Morales was bestowed
apparent authority to enter binding contracts by Gina. First,

although Gina testified she alone had authority to hire an attorney, Curry testified that he hired an attorney for Luna after receiving permission from Gina. (Gina Dep. Doc. # 46-3 at 37:4-6; Curry Dep. Doc. # 46-4 at 55:22-56:8). If so, then Curry's calling and officially hiring an attorney would not be an unauthorized act because Gina delegated that duty to him. Even if Curry never had permission from Gina to hire an attorney, one unauthorized act of a different type by a different employee does not support that Gina so poorly supervised Morales as to endow him with apparent authority to enter binding contracts or joint venture agreements with suppliers.

In short, taking all the evidence in the light most favorable to Premier Gaming, there is no genuine issue of material fact as to whether Morales had actual or apparent authority to enter a binding agreement with Premier Gaming on Luna's behalf. See Solnes v. Wallis & Wallis, P.A., 15 F. Supp. 3d 1258, 1267 (S.D. Fla. 2014)("Solnes does not present any evidence that Mrs. Wallis had any authority, either actual or apparent, to bind Defendants."), aff'd sub nom. Solnes v. Wallis & Wallis, P.A, 606 F. App'x 557 (11th Cir. 2015).

Alternatively, Luna argues that, even if apparent authority existed, it was unreasonable for Premier Gaming to

rely on Morales' apparent authority. (Doc. # 46 at 13). Again, "[t]he reliance of a third party on the apparent authority of a principal's agent must be reasonable." Lensa Corp. v. Poinciana Gardens Ass'n, Inc., 765 So. 2d 296, 298 (Fla. 4th DCA 2000).

Here, the Court determines that Premier Gaming's reliance on Morales' alleged apparent authority was unreasonable. Bekhor testified that he never asked Morales what his position was with Luna or whether Morales had authority to enter binding contracts or joint venture agreements. (Bekhor Dep. Doc. # 46-2 at 19:20-20:21, 95:18-21). Nor was any attempt made by Premier Gaming to contact other employees of Luna or to formalize the joint venture agreement Bekhor believed existed between Premier Gaming and Luna.

Bekhor also acknowledged in his deposition that no conversations with Morales took place about the splitting of "profit, expenses, [or] loss." (Id. at 21:12-24); see Advanced Prot. Techs., Inc. v. Square D Co., 390 F. Supp. 2d 1155, 1161 (M.D. Fla. 2005)(holding that Plaintiff failed to show a joint venture existed where the parties agreed to share profits but never discussed or agreed to share losses). True, Bekhor's affidavit, which was submitted in opposition to the

Motion for Summary Judgment, asserts Premier Gaming and Luna "agreed that the parties would each share in the profit or loss from their collaborative effort to obtain and perform the contract." (Bekhor Aff. Doc. # 52-5 at ¶ 7). But the Court is not bound to accept such statement made in contradiction to Bekhor's testimony, especially because no explanation is provided for the contradiction. See McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003)("Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony."); Hamilton v. Sheridan Healthcorp Inc., 602 F. App'x 485, 489 (11th Cir. 2015)("Unless a party can adequately explain such a change in his story from previous testimony, we will not credit the new story." (citing McCormick, 333 F.3d at 1240 n.7)).

Given the extent and quality of the communications between Morales and Bekhor, Premier Gaming's reliance on any apparent authority Morales may have possessed in entering an allegedly $1.2 million joint venture was unreasonable.

**B.  Unjust Enrichment**

In Count II, Premier Gaming asserts a claim for unjust enrichment. (Doc. # 1 at 6). "A claim for unjust enrichment

is an equitable claim, based on a legal fiction created by courts to imply a 'contract' as a matter of law." <u>Tooltrend, Inc. v. CMT Utensili, SRL</u>, 198 F.3d 802, 805 (11th Cir. 1999). "Although the parties may have never by word or deed indicated in any way that there was any agreement between them, the law will, in essence, 'create' an agreement in situations where it is deemed unjust for one party to have received a benefit without having to pay compensation for it." <u>Id.</u> "It derives, not from a 'real' contract but a 'quasi-contract.'" <u>Id.</u> Thus, "Florida law provides that a claim for unjust enrichment cannot be pursued where an express contract exists between the parties concerning the same subject matter." <u>Beaty v. Counsul</u>, No. 8:10-cv-1457-T-33MAP, 2011 WL 6020252, at *8 (M.D. Fla. Dec. 2, 2011).

The elements of a cause of action for unjust enrichment under Florida law are: "(1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff." <u>Lewis v. Seneff</u>, 654 F. Supp. 2d 1349, 1369 (M.D. Fla. 2009).

As for the first element, Luna argues Premier Gaming did not directly confer a benefit on Luna because the "bid information" was "at best de minimis." (Doc. # 46 at 16-17). As Luna emphasizes, only the price set in Premier Gaming's bid information was ultimately included in the Army contract. (Doc. # 51-1 at 2-3; Doc. # 50-1 at 7; Curry Dec. Doc. # 46-6 at ¶ 2). They also emphasize that Premier Gaming's bid information was sent within four and a half hours after Morales emailed it the Army specifications, and that Premier Gaming "had not one penny in hard costs" in putting together the bid. (Doc. # 53 at 9).

Premier Gaming argues that its bid information, which was submitted by Morales to the Army as Luna's bid, was the but-for cause of the Army selecting Luna. (Doc. # 52 at 16-17). The Court agrees. Even if the ultimate contract did not include any information provided by Premier Gaming, Premier Gaming's bid proposal led to Luna being awarded the contract. Taking all the evidence in the light most favorable to Premier Gaming, a genuine issue of material fact exists as to whether Premier Gaming conferred a benefit on Luna. The monetary value of that benefit need not be determined at this stage.

Regarding the second element, Luna argues that Premier Gaming's unjust enrichment claim fails because "[n]either the

Army nor Luna retained [Premier Gaming's] deviant contract specifications." (Doc. # 46 at 20). Luna is correct that the finalized contract between Luna and the Army contained none of the information or design deviations included in Premier Gaming's bid information, with only the bid's price remaining in the final contract. Still, Luna retained the benefit of the bid information at least so far as it submitted the bid information as part of the bid proposal, through which it was ultimately awarded the Army contract.

As for acceptance of the benefit, Luna also argues that Premier Gaming cannot show that "any person at Luna with contractual authority 'accept[ed]' anything from [Premier Gaming]." (Id.). But Luna has presented no case law for the proposition that a benefit must be accepted by an employee with contracting authority to establish an unjust enrichment claim. Morales, regardless of his contracting authority, requested the information and integrated it into the bid proposal that was ultimately submitted on behalf of Luna. Taking all the facts in the light most favorable to Premier Gaming, a genuine issue of material fact exists as to whether Luna accepted and retained a benefit from Premier Gaming.

Finally, Luna argues that it would not be inequitable for Luna to retain any benefit Premier Gaming may have

bestowed. According to Luna, "[f]ederal law prohibits [Premier Gaming] from supplying these kiosk units" to the Army, and thus Premier Gaming could not have profited under the Army contract. (Doc. # 46 at 16). Luna posits that "[i]t would clearly violate public policy to permit a barred supplier to profit from either flouting the federal rules, or ignoring them entirely." (Doc. # 46 at 16). True, "restitution for unjust enrichment is only available provided that 'the action involves no violation or frustration of law nor is it contrary to public policy either directly or indirectly.'" In re Gulf N. Transp., Inc., 340 B.R. 111, 124 (Bankr. M.D. Fla. 2006)(citation omitted). But, at this juncture, the Court is not convinced by Luna's argument that Premier Gaming could not have manufactured all of the units under the Army contract.

Luna argues that Premier Gaming cannot qualify as a "small business concern" — the only type of entity to which the contract could be awarded — because it is not registered with the SBA. (Doc. # 46 at 9). The regulation cited by Luna, 48 C.F.R. § 52.219-6, defines "small business concern" as "a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as

a small business under the size standards in this
solicitation." 48 C.F.R. § 52.219-6(a). This regulation does
not specify that the small business concern must be registered
with the SBA. Therefore, Luna has not shown that Premier
Gaming was ineligible under the Army contract solicitation to
supply the units because Premier Gaming was not registered
with the SBA.

Luna also argues that Premier Gaming is not a "similarly
situated entity" for purposes of the statutes and FARS, and
thus could not have provided one hundred percent of the
kiosks' manufacturing. (Doc. # 53 at 4). The statute, 15
U.S.C. § 657s, provides: "If awarded a contract . . ., a
covered small business concern . . . in the case of a contract
for supplies . . ., may not expend on subcontractors more
than 50 percent of the amount, less the cost of materials,
paid to the concern under the contract." 15 U.S.C. §
657s(a)(2); see also 48 C.F.R. § 52.219-14(c)(2)("By
submission of an offer and execution of a contract, the
Offeror/Contractor agrees that in performance of the contract
in the case of a contract for . . . [s]upplies . . . [t]he
concern shall perform work for at least 50 percent of the
cost of manufacturing the supplies, not including the cost of
materials.").

Although 48 C.F.R. § 52.219-14 does not mention "similarly situated entities," § 657s does include an exception for "similarly situated entities." Essentially, any subcontracting done by a "similarly situated entity" does not count against the fifty percent limit on subcontracting. § 657s(b). If the entity is a subcontractor for a small business concern, the term "similarly situated entity" means "a small business concern." § 657s(e)(2)(A). If the entity is "a subcontractor for a small business concern eligible to receive contracts under section 637(a) of this title," the term "similarly situated entity" means "such a concern" eligible under section 637(a). § 657s(e)(2)(B).

Premier Gaming argues that it is a "similarly situated entity" and thus could have served as a subcontractor manufacturing all of the units. (Doc. # 52 at 14-15). Premier Gaming presents Bekhor's affidavit for the proposition that Premier Gaming was a qualified small business, despite its being unregistered as such, because it meets the size and income requirements. (Bekhor Aff. Doc. # 52-5 at ¶ 10). Because Premier Gaming qualified as a small business concern like Luna, Premier Gaming reasons it qualifies as a "similarly situated entity" under the FARS and relevant statutes. (Doc. # 52 at 14-15). Although Luna argues Premier Gaming is not a

similarly situated entity, it does not dispute that Premier Gaming fit the size and income limits Bekhor swore to.

Furthermore, the Court is not convinced that Premier Gaming had to certify its size standards to the Government in order to be a "small business concern" under the regulations. While certifying itself as such would have allowed Premier Gaming to be identified as a small business concern in SAM before submitting bids of its own, 13 C.F.R. § 121.110, the regulations do not state that Premier Gaming had to be so certified to serve as a subcontractor. Indeed, 48 C.F.R. § 52.219-8(d)(1) provides: "Contractors acting in good faith may rely on written representations by their subcontractors regarding their status as a small business concern." 48 C.F.R. § 52.219-8(d)(1). Thus, based on a plain reading of the regulation, Luna only required a written representation from Premier Gaming that it qualified as a small business in order to legally accept Premier Gaming as a subcontractor.

Taking the facts in the light most favorable to Premier Gaming, there is a genuine issue of material fact as to whether Premier Gaming was a "similarly situated entity" under 15 U.S.C. § 657s. If Premier Gaming were a "similarly situated entity," it could have subcontracted with Luna to perform more than fifty percent of the manufacturing work, as

Premier Gaming alleges the parties agreed. Therefore, summary judgment cannot be granted on this claim on the theory that Premier Gaming could not legally subcontract to provide one hundred percent of the manufacturing of the gaming kiosks. As the Court does not conclude that the alleged agreement between Premier Gaming and Luna would have violated federal statutes and regulations, the Court cannot conclude at this juncture that Premier Gaming cannot establish the third element of its unjust enrichment claim.

While the Court is not convinced that Premier Gaming could not have served as a subcontractor, Luna is correct that certain terms of the alleged agreement between Premier Gaming and Luna were not permissible under the Army contract. For example, the contract specified payment "by electronic fund transfer" and did not allow for payment by dual check, which Bekhor and Morales discussed as the intended payment method. (Curry Dep. Doc. # 46-4 at 32:5-10, 33:1-3; Bekhor Dep. Doc. # 46-2 at 68:6-15).

Furthermore, as Luna points out, Premier Gaming never framed its relationship with Luna as contractor and subcontractor. (Doc. # 53 at 8). Although Premier Gaming casts its alleged agreement with Luna as a joint venture agreement, the parties did not comply with the requirements for joint

ventures in submitting the bid to the Army. Under the FARS, a joint venture "must be in writing," "must do business under its own name," and "must be identified as a joint venture in the System for Award Management (SAM)." 13 C.F.R. § 121.103(h). But Bekhor acknowledged in his deposition that the alleged joint venture was not registered with the federal government. (Bekhor Dep. Doc. # 46-2 at 64:15-21). Similarly, there is no allegation that the purported joint venture did business under its own name.

Nevertheless, the Court does not conclude that details, such as the method of payment contemplated by Bekhor and Morales and the designation of the alleged agreement as a joint venture rather than a subcontracting agreement, render Luna's retention of the benefit equitable. "[U]njust enrichment as an action 'exists to prevent the wrongful retention of a benefit . . . in violation of good conscience and fundamental principles of justice or equity.'" Sharff, Wittmer & Kurtz, P.A., 581 So. 2d at 907 (quoting Challenge Air Transp., Inc. v. Transportes Aereos Nacionales, S.A., 520 So.2d 323, 324 (Fla. 3d DCA 1988)). Where Premier Gaming possibly could have built one hundred percent of the kiosks for Luna, as contemplated and allegedly agreed upon before the bid, the fact that Premier Gaming would have to be

classified as a subcontractor, rather than a joint venture partner, to do so is of little import.

Taking the facts in the light most favorable to Premier Gaming, Morales told Bekhor that Premier Gaming would be the supplier of the gaming kiosks if Luna was awarded the contract. (Bekhor Dep. Doc. # 46-2 at 89:4-6). Although Bekhor and Morales were incorrect about the permissible payment method and designation as a joint venture, Premier Gaming possibly could have performed the work as a subcontractor. Yet, after Luna's bid, which integrated Premier Gaming's bid information, was selected, Luna chose to use a different supplier.

Drawing all reasonable inferences in Premier Gaming's favor, Luna's choice not to use Premier Gaming as its supplier - regardless of whether Bekhor and Morales conceptualized their agreement as a joint venture — violates fundamental principles of justice and equity. See <u>W.R. Townsend Contracting, Inc. v. Jensen Civil Const., Inc.</u>, 728 So. 2d 297, 304 (Fla. 1st DCA 1999)("Jensen Construction's request was for [the subcontractor] Townsend Contracting to provide a guaranteed bid [for the price of supplies], as a result of which benefit [Jensen Construction] was the low bidder on the road project. [Jensen Construction's] winning the [Florida

Department of Transportation] contract for more than $21 million, while paying nothing to [Townsend Contracting] in return, would lead to an inequitable result."). Therefore, Luna's Motion is denied as to Count II.

## C. **Fraud in the Inducement**

Premier Gaming asserts a claim for fraud in the inducement in Count III of the Complaint. (Doc. # 1 at 7). To establish a claim for fraudulent inducement under Florida law, the plaintiff must show "(1) a false statement of a material fact; (2) that the defendant knew or should have known was false; (3) that was made to induce the plaintiff to enter into a contract; and (4) that proximately caused injury to the plaintiff when acting in reliance on the misrepresentation." In re Biddiscombe Int'l, L.L.C., 392 B.R. 909, 914-15 (Bankr. M.D. Fla. 2008).

Luna argues this claim "fails for lack of proof." (Doc. # 46 at 17). It insists Premier Gaming cannot establish this claim because there is no binding contract that was induced, and thus the third element fails. (Id.). Additionally, Luna argues that no "pre-contractual misrepresentations or false statements" have been identified by Premier Gaming. (Id.).

As previously determined, there was no binding contract entered between the parties, so Premier Gaming's claim fails

on that element. Alternatively, the Court agrees with Luna that Premier Gaming has not sufficiently identified a pre-contractual false statement or misrepresentation by Morales, which was known by him to be false. Rather, in his deposition, Bekhor could not identify any false statements made by Morales before the bid was submitted to the Army. (Bekhor Dep. Doc. # 46-2 at 82:20-83:20). The only evidence that made Bekhor think Morales had intended to defraud him was "[t]he fact that [Bekhor] was told [he] was the bid; and per what took place after the fact, [he] was no longer contacted, called, responded to, e-mailed as if [he] did not exist." (Id.).

Premier Gaming's arguments supposedly identifying false statements are insufficient. In its response, Premier Gaming identifies what it claims are two false statements. It asserts that "Morales represented to [Premier Gaming] that in the event that the Contract Award was awarded to Luna, that [Premier Gaming] would be the supplier of the Units." (Doc. # 52 at 18). Additionally, Premier Gaming contends: "Morales's representation to [Premier Gaming] that [it] was the only supplier being considered by Luna was a representation of material fact that induced [Premier Gaming] to enter into the Joint Venture Agreement, and said representation was clearly false." (Id.). According to

Premier Gaming, Curry's testimony that Luna never actually considered using Premier Gaming as a supplier shows that Morales's representations to Premier Gaming before the bid's submission were false. (<u>Id.</u>).

But these assertions are not supported by the record. There is no evidence Morales knew Premier Gaming could not supply the gaming kiosks if the bid was awarded by the Army. There is no evidence Morales knew Curry was drafting his own bid proposal that would use other suppliers, and that Luna would choose to use those suppliers once the bid was awarded to it. Curry testified that he only discovered Morales had submitted a bid using Premier Gaming's information after the bid was awarded to Luna. (Curry Dep. Doc. # 46-4 at 25:9-12, 26:20-25, 33:11-13, 50:12-17). Therefore, Curry only disregarded the possibility of using Premier Gaming as a supplier after the bid was awarded.

No genuine issue of material fact has been presented as to whether Morales knowingly made any false statements to Premier Gaming in order to induce Premier Gaming to provide Luna the bid information. Accordingly, summary judgment for Luna is appropriate for this claim.

### D.  Conversion

In its fourth and final count, Premier Gaming insists that Luna has committed the tort of conversion by converting both Premier Gaming's "proprietary Bid Information and the Contract Award." (Doc. # 1 at 8). "It is well settled that a conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." Senfeld v. Bank of Nova Scotia Tr. Co. (Cayman) Ltd., 450 So. 2d 1157, 1160–61 (Fla. 3d DCA 1984)(citations and footnote omitted); see also Marine Transp. Servs. Sea-Barge Grp., Inc. v. Python High Performance Marine Corp., 16 F.3d 1133, 1140 (11th Cir. 1994)("In Florida, the tort of '[c]onversion is an unauthorized act which deprives another of his property permanently or for an indefinite time.' 'The essence of the tort is not the acquisition of the property; rather, it is the wrongful deprivation.'" (citations omitted)).

"The essence of the tort of conversion is the exercise of wrongful dominion or control over property to the detriment of the rights of the actual owner." DePrince v. Starboard Cruise Servs., Inc., 163 So. 3d 586, 597 (Fla. 3rd DCA 2015)(citation omitted). A claim for conversion "is appropriate even if the specific property 'converted' has no actual value." Total Mktg. Techs., Inc. v. Angel Medflight

_Worldwide Air Ambulance Servs., LLC_, No. 8:10-cv-2680-T-33TBM, 2012 WL 33150, at *3 (M.D. Fla. Jan. 6, 2012)(citations and quotation marks omitted). "[A] claim for conversion may extend to the wrongful taking of intangible business interests." _Id._ Furthermore, "it is not necessary for a person to deprive another of exclusive possession of their property in order to be liable for conversion." _Id._ at *4 (citation omitted).

Regarding the bid information, Luna argues the "conversion theory fails, first, because [the allegedly converted bid information] is de minimis." (Doc. # 46 at 18). Luna emphasizes that the bid information was supplied to Morales within four and a half hours of the Army's specifications being sent to Premier, Premier had no actual expenses related to creation of the bid information, and the bid information contained numerous deviations from the specifications. (_Id._). None of the deviant specifications included in the bid information were incorporated into the final contract between Luna and the Army. And, according to Luna, "[t]he 'bid information' was of no value to [Premier Gaming] because [Premier Gaming] was ineligible to bid or to participate in producing all these units as it sought." (_Id._ at 19).

This argument does not go to whether Luna converted the bid information. Rather, Luna's argument attacks Premier Gaming's assertion that its bid information was highly valuable and that it incurred significant damages as a result of the conversion. But, again, a claim for conversion "is appropriate even if the specific property 'converted' has no actual value." Total Mktg. Techs., Inc., 2012 WL 33150, at *3. Luna has not presented any case law to the contrary. Therefore, Luna has not established that no genuine issue of material fact exists as to the conversion claim as it relates to the bid information.

Nevertheless, the Court agrees with Luna that Premier Gaming's alternate theory of conversion — that Luna converted the contract award — fails. Premier Gaming's framing "the contract award" as its property is unpersuasive. (Doc. # 1 at 8). The Court agrees with Luna that Premier Gaming "never possessed or owned" the contract award, so could not have been deprived of it. (Doc. # 46 at 20).

Thus, summary judgment is inappropriate for the conversion claim to the extent Premier Gaming alleges Luna converted its bid information. The claim does not survive as to the allegation that Luna converted the contract award.

**IV.  Conclusion**

Because summary judgment is warranted as to Counts I and III, Luna's Motion is granted as to those claims. But, because genuine issues of material fact remain as to Counts II and IV, the Motion is denied as to the unjust enrichment and conversion claims.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Defendant Luna Diversified Enterprises, Inc.'s Motion for Summary Judgment (Doc. # 46) is **GRANTED IN PART AND DENIED IN PART.**

(2)  The Motion is **GRANTED** as to Counts I and III. The Motion is **DENIED** as to Counts II and IV.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 18th day of January, 2018.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE